FILED
08/17/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 1, 2017

**STATE OF TENNESSEE v. CALVIN BANKS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-03645       Carolyn W. Blackett, Judge**

———————————————

**No. W2016-01085-CCA-R3-CD**

———————————————

A Shelby County jury convicted the Defendant, Calvin Banks, of first degree premeditated murder and the trial court imposed a sentence of life. On appeal, the Defendant asserts that the evidence supporting his conviction is insufficient because the State failed to establish premeditation. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Seth M. Segraves, Memphis, Tennessee, for the appellant, Calvin Banks.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a dispute between acquaintances that resulted in the shooting death of the victim, Terrence Davis. A Shelby County grand jury indicted the Defendant for first degree premeditated murder and for being a convicted felon in possession of a firearm. At trial, the parties presented the following evidence: William Bryson, a Memphis Police Department ("MPD") officer, testified that, on March 6, 2014, at approximately 2:45 a.m., he responded to a call about a gunshot wound at Methodist North Hospital. After speaking with hospital security, Officer Bryson spoke with the Defendant, who told him that he was involved in a "drug deal in the Greenbrier [Apartments] that went bad." The Defendant claimed that the individual shot him in the foot.

Officer Bryson testified that Officer Jenkins interviewed the Defendant's girlfriend, Lavinceia Allen, who was also at the hospital. She provided a story inconsistent with the Defendant's version of how he was shot. Officer Bryson spoke with the Defendant again due to the inconsistencies. The Defendant retracted his earlier statement and said that he shot himself in the foot with his own gun. He told Officer Bryson that the gun was in the trunk of his girlfriend's car. During this time, Officer Bryson confirmed with detectives in his office that the Defendant was a convicted felon. Ms. Allen, gave consent for officers to search her vehicle for the gun. Officer Bryson testified that the gun was located in and collected from the trunk of Ms. Allen's car.

Alphonso Jenkins, an MPD officer, testified that he spoke with Ms. Allen at Methodist North Hospital in the early morning hours of March 6, 2014. Ms. Allen stated that she and the Defendant had been robbed and during the course of the robbery, the Defendant was shot in the foot. Officer Jenkins confirmed that Ms. Allen gave consent to search her vehicle.

Eric Hutchison, an MPD officer, testified that he collected a loaded .380 Larson automatic gun from the trunk of Ms. Allen's car, a Toyota Camry, on March 6, 2014, at Methodist North Hospital.

The parties stipulated that the Defendant was a convicted felon. The Defendant was convicted on May 17, 2012, of a felony offense in Shelby County.

Shondra Brooks, an MPD officer, testified that on March 6, 2014, she was dispatched to the location of Cedar and North Third. A caller notified police that "some kids" had seen a body lying in the street. When Officer Brooks arrived she observed a man's body on the "side of the curb." Officer Brooks recalled that it was around 7:00 a.m. and daylight when she arrived at this location but that the electricity had been out the night before so the area had been dark. Officer Brooks approached the body and noticed shell casings around the body and blood around the head area. There were no signs of life.

Jason Parish, an MPD officer, testified that he reported to the Cedar and North Third location at around 8:00 a.m. to collect and document evidence. Officer Parish photographed the crime scene and collected shell casings and a projectile.

James K. Smith, an MPD officer, testified that he spoke with residents of the home in the area where the victim's body was found. Sergeant Smith said that, because of the power outage in the area, no one actually saw the crime occur, but two residents said that

they heard at least three gunshots between 9:00 and 11:00 p.m. on March 5, 2014, and then heard a "vehicle squeal off."

Marco Ross, the Shelby County deputy chief medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Ross performed the autopsy relevant to this case and testified that the victim had sustained multiple gunshot wounds. Specifically, he found gunshot wounds on the victim's left cheek, the left side of the victim's jaw, chest, left hand, and left hip. Dr. Ross testified about the gunshot wound to the victim's cheek, saying that the abrasion on the cheek was consistent with a muzzle imprint from a gun. Further, soot was identified on the margins of the wound and in the deep tissue of the wound. Based upon these findings, Dr. Ross opined that the muzzle of the weapon was up against the skin when discharged. Dr. Ross collected bullet fragments from the cheek wound and the chest wound.

Dr. Ross testified that the results of the toxicology showed that the victim had components of heroin in his blood and the presence of Xanax. Dr. Ross testified that the cause of death was due to multiple gunshot wounds and the manner of death was homicide.

Cervinia Braswell, a Tennessee Bureau of Investigation special agent, testified as an expert witness in the field of firearms identification. Special Agent Braswell had occasion to analyze the .380 automatic pistol recovered from Ms. Allen's vehicle. She was also provided with the cartridge casings and spent bullet recovered at the crime scene and the bullet fragments retrieved from the victim's body during the autopsy. Special Agent Braswell testified that the bullet fragments recovered from the victim's body and the spent bullet recovered at the crime scene had been fired from the Defendant's gun. She said that the cartridge casings had the "same shape, firing pin impression, and some similar individual characteristics" but that there "wasn't enough there" for her to "conclusively say" the cartridges were fired from the Defendant's gun.

Raphael Farmer testified that he and the Defendant were from "the same neighborhood." He acknowledged that he had a history of criminal convictions and was currently serving a probation sentence. He recalled that he was incarcerated in June 2014 and requested to speak with a detective. Mr. Farmer told detectives that while he and the Defendant were incarcerated together, the Defendant told him about his involvement in the robbery. The Defendant told Mr. Farmer about the robbery and how they "didn't get nothing." The Defendant appeared to be angry that the victim had told him about the target of the robbery and then they had not found what the victim told them they would. The Defendant said he was so angry that he got out of the car on Cedar Street, and he shot the victim in the head. The Defendant stated, "F**k the n***er. He a junkie anyway." The Defendant said that they left the victim on Cedar Street and drove away.

The Defendant told Mr. Farmer that "a bitch" and "Ali" were with him when he shot the victim. He also told Mr. Farmer how he was caught. The Defendant told Mr. Farmer that he shot himself in the foot and the police recovered the gun, at the hospital.

In a hearing held outside the presence of the jury, Lavinceia Allen testified that she, for the first time on the day of her testimony, disclosed to the prosecutor that she was an eyewitness to the homicide. She identified a letter of immunity that was included in the record. The document provided immunity for any false statements Ms. Allen had given to the police in connection with this case and any assistance she provided before, during, or after the homicide. The trial resumed and Ms. Allen testified that she had been living with a "secret" for the past two years. Ms. Allen said that in 2014, the Defendant was her boyfriend.

Ms. Allen testified that, on the day of the murder, the Defendant had borrowed her car. He had been gone most of the day, and Ms. Allen had been calling him to try to get him to return her car. That night he returned but there were other people in the car when she got into the car. She said that it was her understanding that the Defendant, who was driving, was to drop off the other people in the car: "Ali," "Little Yo," and "Deedee." Ms. Allen recalled that, when she got in the car, the Defendant was upset because "the mission" had not gone well. She said that the Defendant was specifically mad at the victim but was "taking the frustration out on everyone." She said the men in the car were "bickering" as they drove. The Defendant drove to a street in North Memphis and stopped the car. The Defendant was cursing and ordered everyone out of the car except Ms. Allen. The men stood behind the car talking. Ms. Allen recalled seeing the Defendant's "gun go up." She said this shocked her, and she closed her eyes. She heard gunfire but did not recall how many shots. The men remained outside for "a minute" and then the Defendant, Ali, and Little Yo got back in the car without the victim.

Ms. Allen testified that they drove away and dropped off Ali and Little Yo at "the house." During that drive, there was a lot of "conflict" with the Defendant "going off on everybody." Ms. Allen said she remained quiet because she "feared for [her] life." The Defendant drove Ms. Allen back to Ridgecrest Apartments where Ms. Allen lived. As the Defendant was attempting to park the vehicle, "he reached down and was doing something and the gun went off." Ms. Allen testified that she was terrified based upon the events of the evening. The Defendant stated that he had shot himself and asked her to drive him to the hospital. On the drive to the hospital, the Defendant passed out. Once there, the police arrived and spoke with Ms. Allen. Ms. Allen told the police that she and the Defendant had been robbed. She said that the robbery "story" was the Defendant's "story." Later, the police searched her car and found the Defendant's gun in the trunk. Ms. Allen admitted that she put the gun in the trunk after the Defendant shot himself.

- 4 -

She said she acted out of panic when she "threw it" in the trunk and then drove him to the hospital.

Ms. Allen testified that the Defendant called her from jail following treatment at the hospital and told her he was "mad" at her for letting "them get his baby." Ms. Allen believed the Defendant to be referencing his gun. Ms. Allen agreed that she had never told anyone about witnessing the murder. She explained that she never spoke of it because she was scared of the Defendant. She agreed that she lied to the police about the homicide but stated that she did so to protect herself, not to protect the Defendant.

On cross-examination, Ms. Allen clarified that, at the hospital, she told the police that the Defendant shot himself in the foot and that it was the Defendant who told the police that he was the victim of a robbery. She confirmed that the police did not ask anything about the homicide at the time they were at the hospital. Later, Ms. Allen went to the police station and spoke with the police regarding the homicide. She agreed that she lied to police but reiterated that she lied to protect herself and her child. She agreed that she did nothing to help with the investigation. Ms. Allen could not recall whether the street lights were on when the shooting occurred but she believed they were on.

Tonya Nelson, the victim's mother, testified that the victim was twenty-five years old at the time of his death. He was the father of two children a girl and a boy, ages eight and four. Ms. Nelson said at the time of the victim's death his left arm, his dominant hand, was casted following a surgery due to injuries sustained during an assault. The victim also had bandages on his face. Ms. Nelson acknowledged that her son had a drug addiction, which brought him in contact with "rough people." On the nights leading up to his death, the victim was staying at "Ali's house" in the Ridgecrest Apartments. The parties entered a second stipulation agreeing that the victim was the same person whose body was found in the area of Cedar and North Third Street on March 6, 2014, and the subject of the autopsy in this case.

After hearing the evidence, the jury convicted the Defendant of first degree premeditated murder and being a convicted felon in possession of a firearm. The trial court imposed a life sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence presented at trial was insufficient to establish premeditation. He asserts that the evidence established a "reactionary killing" during a heated argument, which is second degree murder. The State responds that the evidence that the Defendant repeatedly shot the victim, with at least one shot delivered with the gun pressed against the victim's cheek, is more than

sufficient to sustain the conviction for first degree premeditated murder. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014).  Premeditation refers to "an act done after the exercise of reflection and judgment."  T.C.A. § 39-13-202(d) (2014).  Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue.  *Bland*, 958 S.W.2d at 660.  The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "preexist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing.  T.C.A. § 39-13-202(d) (2014).

Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances.  *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003).  Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include:  the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing.  *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *Bland*, 958 S.W.2d at 660.  In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the [defendant] prior to the killing, the [defendant's] prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry,* 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)).  Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation."  *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

These factors are not exhaustive. A jury is not limited to any specific evidence when determining whether a defendant intentionally killed the victim "after the exercise of reflection and judgment." *Id*. at 615 (citing T.C.A. § 39-13-202(d) (1991 and Supp. 1995)). Additional factors indicative of the existence of premeditation include a lack of provocation on the part of a victim and the defendant's failure to render aid to a victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In this case, the jury heard evidence from which it could reasonably and rationally infer that the Defendant acted with premeditation. The Defendant was angry at the victim because he blamed the victim for a failed robbery. As they returned from the failed robbery, the Defendant stopped the car and ordered the victim, Little Yo, and Ali out of the car. The Defendant used a deadly weapon to shoot the unarmed victim four times, one of which was with the muzzle of the gun pressed to the victim's cheek. After the shooting, the Defendant left the scene leaving the victim lying in the street. It is both rational and reasonable that the jury concluded from the evidence that the Defendant shot the victim intentionally and with premeditation. As the State points out in its brief, the existence of the element of premeditation is a question for the jury that may be established by proof of the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660.

Accordingly, the jury's verdict of guilt is sufficiently supported by the evidence. For this reason, we reject the Defendant's argument that the evidence is only sufficient to support a conviction for second degree murder. We cannot disregard the jury's resolution of questions of witness credibility, weight and value of the evidence, and substitute our own inferences from the evidence. *Id*. at 659. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

- 8 -